| UNITED STATES DISTRICT COURT | ONLINE PUBLICATION ONLY |
| EASTERN DISTRICT OF NEW YORK | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X | |
| UNITED STATES OF AMERICA, | |
| | STATEMENT OF REASONS FOR SENTENCE |
| -against- | |
| | 09-CR-216 (JG) |
| ISAAC OVID, | |
| *Defendant*. | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X | |

JOHN GLEESON, United States District Judge:

A. *Preliminary Statement*

In a letter dated June 28, 2010 to the Chair of the United States Sentencing Commission, the Director of the Office of Policy and Legislation of the United States Department of Justice ("DOJ" or the "Department") decries the "evolution" of "two distinct and very different sentencing regimes." Letter from Jonathan J. Wroblewski to the Hon. William K. Sessions III, at 2, 1 (June 28, 2010) ("DOJ Letter"). One "regime," the letter contends, "includes the cases sentenced by federal judges who continue to impose sentences within the applicable guideline range for most offenders and most offenses." *Id*. at 1. This is apparently the good regime. The "second regime," by contrast, "has largely lost its moorings to the sentencing guidelines." *Id.* at 2. This regime is a cause of concern for the Department. It consists of judges who sentence fraud offenders, especially in high-loss cases, "inconsistently and without regard to the federal sentencing guidelines." *Id.* at 4. The Department concludes on this issue (the letter addresses various others as well) that "[t]he current sentencing outcomes in [fraud] cases are unacceptable, and the Commission should determine whether some reforms are needed." *Id.* at 5. In short, the premise of the letter is that unless the sentences in fraud cases are

"moored" to the advisory ranges provided by the United States Sentencing Guidelines, they produce "unwarranted sentencing disparities" that are "extremely problematic." *Id.* at 2.

The DOJ Letter recommends, *inter alia*, a systemic analysis and synthesis by the Commission of the federal sentencing data it has collected, followed by a report that "explore[s] how to create a single sentencing regime that will earn the respect of the vast majority of judges, prosecutors, defense attorneys, Members of Congress, probation officers, and the public." *Id.* at 3. It also suggests that "reforms might include amendments to the sentencing guideline for fraud offenses." *Id.* at 5.

The Department is an important influence in the formulation of sentencing policy. Jonathan Wroblewski, the author of the letter, is a thoughtful and well-respected expert in the area. Finally, the Attorney General enjoys *ex officio* membership on the Sentencing Commission, and Mr. Wroblewski is the Attorney General's designee to that post. For all these reasons, the DOJ Letter to the Commission will carry great weight.

The sentencing of Isaac Ovid on July 30, 2010 illustrates well the fact that, here in the trenches where fraud sentences are actually imposed, there is a more nuanced reality than the DOJ Letter suggests. The letter describes two "dichotomous regimes" in fraud cases – one moored to the Guidelines, the other adrift in the vast regions beneath the low end of the advisory Guidelines ranges. *Id.* at 2. But Ovid's sentencing shows otherwise. Specifically, it shows how the fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so. This reality does not render the Guidelines irrelevant in fraud cases; they are in fact quite useful in all sentencings. But sentencing judges know that a full consideration of "the nature and circumstances of the offense and the history and characteristics

of the defendant," 18 U.S.C. § 3553(a)(1), implicates offense and offender characteristics that are too numerous and varied, and occur in too many different combinations, to be captured, much less quantified, in the Commission's Guidelines Manual.  A consideration of those and the other factors set forth in § 3553(a) produces sentences that are moored to fairness, and to the goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range.  Indeed, in some cases the fair sentence can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider.[1]

Ovid's sentencing reveals that the Department knows this as well. Aggressive, experienced, successful white collar prosecutors understand that it does not undermine the Sentencing Guidelines at all, much less create some kind of rogue sentencing regime, when the consideration of factors set forth in 18 U.S.C § 3553(a) produces a sentence that happens to be substantially below the advisory range.

I support the Department's call for Sentencing Commission review of fraud sentences.  But in determining whether reforms are needed, and especially in determining whether the existing guideline should be burdened with even more adjustments, the Commission should examine whether our system already provides an adequate solution for the claimed "unacceptable" outcomes the Department complains about.  I suggest that it does, in the form of appellate review, and for all of the handwringing in the DOJ Letter about unacceptable sentences, the Department for the most part has not even tried to avail itself of that solution.

---

[1] The other seven are (1) the nature and circumstances of the offense; (2) the history and characteristics of the offender; (3) the need for the sentence imposed to reflect the goals of sentencing (just deserts, general deterrence, incapacitation of the offender, and rehabilitation) set forth in § 3553(a)(2); (4) the kinds of sentences available; (5) the Commission's policy statements; (6) the need to avoid unwarranted sentence disparities among similar defendants who commit similar crimes; and (7) the need to provide restitution to victims.  *See* 18 U.S.C § 3553(a).

B. *The Ovid Sentencing*

1. *The Fraudulent Scheme*

On March 5, 2010, Isaac Ovid pled guilty to Count One of a three-count indictment. It charged him with conspiring between November 2004 and December 2005 to commit securities fraud in relation to two hedge funds, the Logos Fund and the Donum Fund.

Between 2002 and 2006, Ovid was an ordained minister of the Local Christian Assembly (the "Church") in Queens, New York. He also provided private investment services to his family, friends and Church members. In October 2004, when Ovid was just 23 years old, he and his coconspirators formed Jadis Capital, an investment management company. Ovid provided $445,000 in start-up money, which included $100,000 of his own funds.

Between November 2004 and December 2005, Ovid and others created the first of the two hedge funds, the Logos Fund. Neither fund was registered with the SEC, which meant the funds could legally be marketed only to individuals meeting specified income thresholds. However, Ovid and his coconspirators marketed the funds to friends, family and Church members who did not meet these thresholds. In addition, the private placement memorandums used to market the Logos Fund contained numerous fraudulent misrepresentations and omitted material facts.

By February 2005, nearly all of the start-up money for Jadis Capital was depleted. Ovid and coconspirator Aaron Riddle agreed that they would use the money from the Logos Fund to operate Jadis Capital. Approximately $3.5 million was used to pay Jadis Capital's operating expenses, including a $1.6 million buildout of extravagant offices on Long Island. Another $1.6 million was used to purchase luxury items for the defendants and their family members, and to make payments to their businesses and to charities. Logos Fund money was

4

also used to finance a business created by coconspirator Robert Riddle and his wife and to repay Ovid's debts to his former client.

In May 2005, Ovid began trading the money invested in the Logos Fund and within two weeks he lost more than $2 million, which almost entirely depleted the trading account. Thereafter, from May to mid-August 2005, Ovid stopped trading, but he instructed others to falsely advise prospective investors that Logos Fund was performing at a year-to-date profit of 15%.

In August 2005, Ovid and his coconspirators established the Donum Fund. They marketed it to larger, institutional investors. The private placement memorandums included the same misrepresentations as the Logos Fund memorandums and some others as well. Between August and November 2005, almost $3.1 million was invested in the Donum Fund by outside investors, including $3 million by a group from Panama.

By November 2005, the funds had collapsed. Ovid and several other Jadis Capital executive team members apologized to the defrauded Church members during services. A letter was written in December 2005 advising investors in the Logos Fund that their investments had been lost. Ovid was forced out of the company and returned to Trinidad. After seeking legal advice, the defendants advised the SEC of the fraud.

    2. *The Advisory Guidelines Range*

The advisory Guidelines range for Ovid was 210-262 months. His base offense level was 6; he received upward enhancements of 20 levels for a loss greater than $7 million, 4 levels for more than 50 victims, 4 levels for being associated with a registered broker, 2 levels for preying on vulnerable victims, and 4 levels for his leadership role in the offense. His early

5

guilty plea earned him a 3-level reduction for acceptance of responsibility. The total offense level was 37, which in Criminal History Category I yields a range of 210-262 months.

3. *The Sentence*

Ovid was sentenced to 60 months in the custody of the Attorney General and a three-year term of supervised release with various special conditions. He was ordered to pay restitution and was subjected to an agreed-upon forfeiture order.

C. *The Reasons for the Sentence*

The reasons for the sentence were stated at the sentencing proceeding. They were:

- "Jadis Capital, the Uniondale company in this case, was not . . . started as a fraud."

- "As opposed to your pump and dumps and some of these other types of criminal schemes that the court has . . . seen over the years, this Jadis Capital . . . was started with the best of intentions. This firm was hoping to benefit the lives of the ministers and the people associated with the church who went to work at the firm and also specifically intended to benefit the members of the congregation."

- "Mr. Ovid was . . . at the center of Jadis Capital. . . . [B]y the age of 23 years old, . . . there was a buzz about Isaac Ovid, that he really knew how to trade and that he was very successful trading stocks in the stock markets. . . . Mr. Ovid to some extent believed that he could pull this off; that he could be the supertrader that he and his co-conspirators were saying that he was."

- "Mr. Ovid provided money for start-up costs of Jadis Capital. . . . [H]e had had success and . . . he did have some liquidity during the period of 2004 where he was able to contribute money, his own money, to the start-up of this company."

- "The idea for hedge funds was not necessarily the original idea for the company. It was going to be a venture capital company where they were going to go out and open up businesses. . . . There was a buzz in this church about Isaac Ovid and about his abilities."

- "[Ovid] never drew a salary from Jadis Capital. Now, did he avail himself of an expense account like many of the other members of Jadis Capital? Absolutely. But we do have him investing some portion of his own money, of $450,000 that he puts into the company when the company starts. Some portion of that, purportedly as much as a hundred thousand dollars of that, comes from Mr. Ovid. And thereafter Mr. Ovid . . . does not collect a salary."

- "In late December of 2004 Mr. Ovid goes to . . . South Africa on a missionary cause related to his work with the church, and he is unable to get back into the United States; and he remains out of the United States from December up until late April, early May of 2005, which is when all of this, the vast majority of the $9.3 million into the Logos Fund, is being collected. . . . That's not to say that Mr. Ovid wasn't directing matters from far away. He was having conference calls with his underlings . . . ."

- "The expenses were excessive for what it was that these gentlemen were running, but we are not talking about expenses that are, you know, $2 million parties for your wife.[2] We are talking about flying first class wherever you go, going out to Ruth's Chris steakhouse for every business-related meeting, a Rolex for each one of the members of the firm, to present the image of being successful. Were they right to do this? Absolutely not. But these were expenses that in some businesses are covered under business expenses, but they were certainly excessive."

- "Now, were there things in the [private placement memorandums] and the offering documents that were untrue? Absolutely. They didn't represent that Mr. Ovid was even affiliated with the fund. But to most people who were associated with the church, that wasn't really a material misrepresentation to them, because they all knew that Mr. Ovid was the person that was going to be trading. [A] lot of the folks who put money into this fund did so without looking at the proposals or without looking at the literature. They believed in Mr. Ovid."

- "By August of 2005 it was clear to the people at the highest levels, including Mr. Ovid, that the firm was [having] serious financial problems. Mr. Ovid . . . actually tried to cut back all of the costs at Jadis Capital and . . . they ended up firing most of their staff. They fired one of their own partners in the firm at that time."

- "Where did all that money go? That money went towards the $1.6 million build-out [of the Jadis offices]. That money went towards all the salaries for all the defendants and their family members who were working there. That money went toward paying Mr. Ovid's expense accounts, which included his stays at hotels and other expenses, not grandiose expenses but expenses nevertheless. They were expenses that he incurred. Throughout this time he was not receiving a salary at all. There was no evidence that . . . he was siphoning off money out of the company for his own personal gain."

---

[2] This was a reference to the prosecution of former Tyco International CEO L. Dennis Kozlowski, who was sentenced in state court in 2005 to an indeterminate prison term of eight and one-third to 25 years.

- "[T]here is no evidence of him sending money off into foreign accounts."

- "By September 2005, when it came to a head and everybody at the firm realized that the investor funds had been decimated, they then sort of took a swing for the fences; and that's where the Panamanians come in. And that was a deal that, frankly, Mr. Ovid, even though he was a co-conspirator in it, wasn't personally involved in. He did not seek out this investment. This investment from Panama came in, a $3 million investment, that was orchestrated or solicited by his co-conspirators. Mr. Ovid was either explicitly or implicitly asked not to be part of the presentation to the Panamanian investors so as not to run them off by the fact he was a 23-year-old kid; and there were some people at the firm who didn't think that was a good idea to present him as their chief trader at that time."

- "[After they] were able to convince the Panamanians to put $3 million into the fund, . . . Mr. Ovid was asked by his co-conspirators and he was convinced he could get back into trading, and he went back to trading and he went and traded the $3 million and ended up losing $500,000 of it in very short order. It was at that point that [Ovid] and his codefendants realized that their sort of scheme was done and they couldn't survive. They went back to the church, in early November of 2005. They repented, to use their words, and went and told the church about everything that had happened and called all of their investors in and explained to them what it was they had done wrong. Mr. Ovid appeared before the congregation on November 5 and November 16, I think, of 2005 and confessed to the members of the church as to what he had done."

- "[On] December 22 of 2005 Mr. Ovid was in the SEC on an entirely voluntary basis giving . . . them a fulsome explanation of what it was that was going on at Jadis Capital. He then went back to Trinidad, returned again, I believe, in January of 2005, and gave another full debriefing to the SEC."

- "He appeared in the office of the U.S. Attorney in March of 2005 and gave another full statement about his involvement in this case."

- "[T]he guidelines often look to the amount of loss as a proxy for culpability, and certainly here the amount of loss is huge, [but] . . . the defendant and his co-conspirators all believed that this was actually going to work. . . . [O]ne gets a strong sense that the people who were affiliated with Jadis Capital really believed that this was going to work and that this was a – this was going to, to use their terms, bless everybody."

- "There is a measure of exploitation here, but it's hard to put that label on [it] when the people who started the firm did so with the best of intentions and did so to benefit all of the people in the church. And what happened here and what makes this a fraud is that their best intentions were entirely mismanaged, and when the problems blew up they didn't know how to handle it, and people like Mr. Ovid decided that the best way to survive the thing is to ride it out and not tell anybody what you are doing while you know that your . . . marketing materials contained misrepresentations."

8

- As for remorse, it was "demonstrated heavily" by Ovid.

- "I think in a situation like this, . . . a sentence of 60 months is appropriate in light of the fact that Mr. Ovid was a . . . net zero winner."

Transcript of Proceedings at 9-19 (July 30, 2010).

Though all of these factors are properly considered pursuant to 18 U.S.C § 3553(a), they are not adequately accounted for in the Guidelines themselves. In combination, and taking into account all the facts of the case, the advisory Guidelines range and the other factors enumerated in § 3553(a), a 60-month term of imprisonment, 12 and one-half years less than the low end of the advisory Guidelines range of 210-262 months, was warranted.

D. *The Importance of Non-Guidelines Factors in Sentencing*

Even though Ovid's sentence amounted to a significant variance from the advisory Guidelines range, the Department does not regard it as an "unacceptable" sentencing outcome. This case will not be cited as evidence of a "second regime" of sentencing that breeds disrespect for our system. To the contrary, the Department regards Ovid's 60-month sentence as the just result of a careful consideration of all the relevant sentencing factors – including the advisory range – and as entirely consistent with the Guidelines themselves.

I say this with confidence because all of the above-quoted statements from the sentencing proceeding were made by the prosecutor. The government had entered into a plea agreement with Ovid pursuant to Fed. R. Crim. P. 11(c)(1)(A). In exchange for Ovid's plea of guilty to Count One, which carried a five-year statutory maximum, the government agreed to dismiss other pending charges, which exposed Ovid to an additional 40 years in prison. The Guidelines instruct me that such a "charge bargain" may be accepted upon a finding by me that

9

the offense of conviction "adequately reflect[s] the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines." U.S.S.G. § 6B1.2(a). In its effort to persuade me to accept the bargain, the prosecution cited the factors set forth above and contended that it would not undermine the Guidelines for me to impose a 60-month sentence.[3]

Even though the prosecutor was justifying his plea bargain, not imposing sentence, I couldn't help thinking as I listened to his various reasons for why it was all right to cap Ovid's sentence at 60 months that this is what sentencing judges do. We canvass all of the many features of the case that bear on the culpability of the defendant. Though some of those features have been considered by the Sentencing Commission and incorporated into the Guidelines calculation, many are not. But they are still part of the nature and circumstances of the offense, or part of the history and characteristics of the defendant, and thus may (indeed must) be factored into the sentence by the judge.

As if to make this point even clearer, by happenstance Ovid was sentenced moments after the sentencing of Aisha Hall in *United States v. Aisha Hall*, 09-CR-292-JG-7 (E.D.N.Y.). Hall's fraudulent scheme involved the creation of phony "Proof of Funds" letters and the bribery of low-level bank officers to fraudulently verify that the funds described in the letters were in fact on deposit. As far as the Guidelines are concerned, Hall and Ovid were

---

[3] These are not soft prosecutors. Like her counterpart a mile away in the Southern District of New York, with whom she competes for results, the United States Attorney in this district aggressively pursues white collar offenders. *See, e.g*., Amir Efrati & Tom McGinty, "Youz Indictin' Who? A Rivalry Grows for Stock Cops in Brooklyn, Manhattan," *Wall St. J.*, June 20, 2008, at C1; Paul Davies & Peter Lattman, "Subway Series Alive After All: The Legal One – Federal Prosecutors in Brooklyn One-Up Prosecutors Across River, Snag More White-Collar Cases," *Wall St. J.*, Oct. 11, 2006, at C1. The particular AUSA in charge of the *Ovid* case is an experienced and decorated white collar prosecutor.

similar. Hall's calculation did not include Ovid's four-level adjustment for association with a broker dealer or two-level adjustment for preying on vulnerable victims, so her advisory range was 151-188 months, somewhat lower than Ovid's 210-262 month range. Nevertheless, the loss quantities involved were roughly comparable (Hall received an 18-level adjustment as compared to the 20-level adjustment for loss in Ovid's case); both schemes involved more than 50 victims; both defendants received four-level role adjustments for being leaders of their schemes; both pled guilty and received credit for accepting responsibility; and neither had any criminal history.

Like the Department, I "begin from the principle that offenders who commit similar offenses and have similar criminal histories should be sentenced similarly." DOJ Letter at 2. But the fact that two fraud defendants have similar or even identical *Guidelines ranges* does not necessarily mean they committed similar offenses. In ways captured by the § 3553(a) factors but not sufficiently by the Guidelines themselves, Hall was more culpable than Ovid. Her scheme was 100% fraudulent from the outset; her crime involved neither good intentions nor legitimate business activities. When Hall's scheme collapsed, she did not convene her victims to disclose and apologize, as did Ovid; rather, she took steps to evade detection. Unlike Ovid, Hall did not invest (and lose) her own money in her business. And unlike Ovid, Hall drew a considerable amount of money (about $4 million) out of the fraudulent business, and it remained unaccounted for at sentencing. Though both defendants received the maximum upward adjustment for their leadership role, Hall micromanaged every aspect of her scheme, whereas Ovid was uninvolved (at least directly) in much of the fraudulent activity. Also, because Hall's brazen scheme unraveled quickly, there was no danger that the loss amount in her case (gain was used as a proxy pursuant to Application Note 3(B) to U.S.S.G. § 2B1.1) would play a disproportionate role in her advisory Guidelines range calculation. And whereas Ovid's remorse

11

was deep and sincere, Hall's was tepid; even though she admitted her fraud and clearly accepted responsibility for it, she persisted with her implausible claim that no one was actually harmed by the scheme.

Other § 3553(a) factors further differentiated Ovid from Hall. Specifically, the government mentioned a heightened need for the Hall sentence to promote general deterrence; because these proof-of-fund-letter schemes, it argued, are of recent vintage and are cropping up around the country, a strong deterrent message needed to be sent.

So whereas the government asked me to sentence Ovid to a prison term 12 and one-half years below his advisory range, it requested that Hall's sentence be "close to the advisory Guidelines range." Letter in Response to Defendant's Sentencing Memorandum from Assistant United States Attorney Winston M. Paes to the Court in *United States v. Aisha Hall*, 09-CR-292-JG-7 (E.D.N.Y.), at 1 (July 30, 2010). I sentenced Hall to a 126-month term of imprisonment, more than twice the length of the 60-month jail term imposed on Ovid, even though the low end of Hall's sentencing range was five years lower than the low end of Ovid's.

The disparity between these two sentences cannot reasonably be described as unwarranted. When all the relevant factors were considered, Ovid and Hall were not, in the end, similarly situated.

E. *The Remedy for Unwarranted Disparities*

It remains true, of course, that a sentencing regime that permits consideration and weighing of all the various circumstances present in a case will result in disparities. Sentencing is not scientific, and the weight to be accorded, for example, Ovid's pure intentions at the outset, or his lack of personal profit from the scheme, or his confessions and apologies to his congregation and the SEC, are matters of judgment, not precise calibration. Reasonable people

12

will reach different results. Indeed, though I agreed with the prosecutor's observations about Ovid, and a 60-month term was not unreasonable, I would have weighed the various factors differently and sentenced Ovid to more time in prison were it not for the 60-month cap imposed by the plea agreement I accepted.[4] I have no doubt some of my brother and sister judges might have weighed them differently than I did. Some might have imposed less than 60 months in prison; others might have rejected the plea agreement based on a judgment that a sentence no greater than 60 months could not adequately reflect the seriousness of Ovid's fraud, or would undermine the purposes of sentencing or the Guidelines themselves. The same is true with regard to Hall. The prosecutor no doubt thought her sentence, which was 25 months below the low end of the range, should have been closer to that range; other judges might have agreed, and still others might have sentenced Hall to an even shorter term.

There is nothing surprising or disturbing about the fact that once judgment is allowed to play a role in sentencing, it will be exercised differently by different people. It is the natural consequence of permitting judges to judge – to fashion a just sentence based on all the relevant facts in each particular case. The faithful discharge of the obligation to consider all the § 3553(a) factors will produce a range of reasonable outcomes because there are so many relevant considerations that are so difficult to weigh, individually and in combination. That reality is not altered by the illusion of precise calculation created by the ever-expanding fraud

---

[4] Though I would have imposed a longer jail term, for reasons I have expressed at length elsewhere I believe plea bargains that affect sentences are entitled to substantial deference, and I therefore accepted the plea agreement. *See* John Gleeson, "The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentence Bargains," 36 *Hofstra L. Rev.* 639 (2008). Although that essay specifically addressed "sentence bargains" pursuant to Fed. R. Crim. P. 11(c)(1)(C), the reasons for deferring to sentence bargains apply equally to charge bargains like the one in this case. There are several such reasons, but one is that plea bargaining "help[s] to leaven a sentencing regime that is too harsh." *Id.* at 658.

13

guideline and the rest of the now 539-page Guidelines Manual. Thus, across the range of judges in the system, cases that are indeed similar will be sentenced differently. If that's all the DOJ Letter means when it refers to reports by prosecutors that "judicial assignment" matters in a case, DOJ Letter at 2, the letter is correct but the observation is unremarkable.

I suspect the Department's concerns run deeper than that. Implicit in the way it describes a series of "inconsistent[]" fraud sentences that it plainly thinks were wayward, *see* DOJ Letter at 4-5, is the claim that judges are inexplicably and unjustifiably all over the lot, sentencing based on their personal preferences and producing the kind of unwarranted disparities the Sentencing Reform Act of 1984 and the Sentencing Guidelines were intended to eliminate. If that is correct, I agree it is unacceptable. But the solution to such a problem, if it exists, is not to promulgate more amendments to the Guidelines for fraud offenses, as the DOJ Letter suggests. The fraud guideline, U.S.S.G. § 2B1.1, already contains more than 40 "Specific Offense Characteristics" adjustments, not to mention 16 pages of dense application notes. It is way too complicated as it is.

Rather, if our system really is producing *unwarranted* disparities in fraud sentences, as opposed to disparities based on legitimate individualized sentencing concerns or on the reasonable exercise of judgment by different judges, we already have a remedy. A judge must explain the reasons for each sentence, and those reasons, and the sentences they support, are subject to appellate review. If the sentencing judge fails to calculate the Guidelines range, or calculates it incorrectly, or fails to consider it or any of the other § 3553(a) factors, or fails properly to find the relevant facts, or fails to explain the sentence, including any deviation from the Guidelines range, the sentence is subject to reversal on appeal. *See Gall v. United States*, 552 U.S. 38, 51 (2007). And even if the "sentencing decision is procedurally sound, the appellate

14

court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* Only reasonable sentences may be upheld; outliers will be reversed.

The Sentencing Commission's data for Fiscal Year 2009 show that of 8,055 sentences imposed pursuant to the fraud guideline, 1,711 were below the advisory range (excluding "government-sponsored" variations from the range).[5] If those sentences were imposed at the whim of individual sentencing judges, as the DOJ Letter suggests is happening with sufficient frequency that a "second regime" has evolved, the government should appeal them. But the Commission's data show that the government almost never appeals sentences on the ground that the § 3553(a) factors were incorrectly applied. In Fiscal Year 2009 it appealed a total of only 18 such sentences.[6] Even if every one of those appeals involved a fraud sentence, only 1% of the cases the DOJ Letter describes as "extremely problematic" are being appealed by the government.

Even with respect to the eight sentences specifically identified in the DOJ Letter, which are presumably the most egregious examples of what it describes as "unacceptable" fraud sentences, the government either didn't appeal or withdrew its appeal in all but one of them. Five were imposed in *United States v. Ferguson et al.*, 06-CR-137 (CFD) (D. Conn.), and though the government filed notices of appeal, it withdrew them in exchange for the defendants' agreement not to appeal the sentences as too *harsh*. The government also withdrew its appeal in *United States v. Turkcan*, 08-CR-428 (DJS) (E.D. Mo.), and it never even filed an appeal in

---

[5] United States Sentencing Commission, *2009 Sourcebook of Federal Sentencing Statistics* 78 tbl.28.

[6] *Id.* at 144 tbl.58.

*United States v. Stinn*, 07-CR-113 (NG) (E.D.N.Y.).  The remaining sentence was appealed and the government persisted in its challenge, but the appellate panel affirmed summarily, explicitly rejecting the government's claim that the district court acted on its "personal view" rather than pursuant to the § 3553(a) factors.  *United States v. Adelson*, 301 Fed. Appx. 93, 95 (2d Cir. 2008) (quotation marks omitted).  The court also observed, as I have here, that fraud cases present a wide spectrum of culpability, and the careful application of the § 3553(a) factors to fraud defendants may properly result in the imposition of sentences well below the advisory range. *See id.* at 94-95 (citing *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (en banc)).

        I don't know why the Department has chosen to complain about fraud sentences to the Commission but not to the circuit courts of appeals.  It has no reason to believe such appeals would be futile – in the handful of cases in which the government has challenged sentences based on the sentencing judges' application of the § 3553(a) factors, it has prevailed two-thirds of the time.[7]  Perhaps, as in this case, the prosecutors who are actually handling the cases in the courtrooms do not regard the sentences as unacceptable simply because they are below the advisory Guidelines ranges.  In any event, if the problem the DOJ Letter identifies in this area of federal sentencing in fact exists, there is no need for reform, as the solution is already available.

                                      John Gleeson, U.S.D.J.

Dated: October 1, 2010
       Brooklyn, New York

---

[7] *2009 Sourcebook of Federal Sentencing Statistics* at 144 tbl.58.