UNITED STATES OF AMERICA,                      MEMORANDUM AND ORDER

         - versus -                               09-CR-216 (JG) (ALC)

ISAAC OVID, AARON RIDDLE, JOSEPH
JONATHAN COLEMAN, and ROBERT
RIDDLE,

                Defendants.

A P P E A R A N C E S :

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:   Brian D. Morris
        *Attorney for the United States*
        *of America*

    FISHMAN JACKSON LUEBKER PLLC
        700 Three Galleria Tower
        13155 Noel Road, LB 13
        Dallas, Texas 75240
    By:   Monica L. Luebker
        Jay E. Ray
        *Attorneys for Third-Party Petitioner*
        *QBE del Istmo, Compania de Reaseguros, Inc.*

JOHN GLEESON, United States District Judge:

        In this ancillary proceeding, brought pursuant to 21 U.S.C. § 853(n) and Rule 32.2(c) of the Federal Rules of Criminal Procedure, third-party petitioner QBE del Istmo, Compania de Reaseguros, Inc. ("QBE") challenges the criminal forfeiture of $2,565,456.89 plus interest (the "Funds") from a limited partnership in which QBE was a limited partner. Before me is the government's motion to dismiss QBE's petition for lack of standing.

I previously referred the motion to then-Magistrate Judge Andrew L. Carter, Jr. In his report and recommendation (the "Report"), Judge Carter recommended granting the motion. QBE has objected to the Report. Although I agree with portions of the Report, I disagree with the ultimate conclusion that QBE lacks standing. I will therefore sustain QBE's objections to the Report, in part, and deny the motion to dismiss.

BACKGROUND

The defendants in the underlying criminal case – Isaac Ovid, Aaron Riddle, Joseph Jonathan Coleman, Timothy Smith and Robert Riddle – perpetrated a multi-million dollar fraud through an investment management company they formed, Jadis Capital, Inc. ("Jadis Capital"). Their fraudulent scheme involved the creation and marketing of two different hedge funds. Both of these hedge funds were formed as separate limited partnerships under Delaware law and both used Jadis Investments, LLC ("Jadis Investments"), a Delaware limited liability company the defendants had also formed, as investment manager.

The defendants formed the first of these hedge funds, Logos Multi-Strategy Hedge Fund I LP (the "Logos Fund"), in November 2004. They marketed the Logos Fund to numerous investors, many of whom were members of a church in which the defendants held positions of authority. *See* Third Party Pet. To Adjudicate Interest in Forfeited Property & To Amend Forfeiture Order ("Pet.") ¶ 23, ECF No. 67. Through numerous fraudulent misrepresentations and omissions, the defendants were able to obtain approximately $9 million in investments in the Logos Fund. *Id.* ¶ 18.

The Logos Fund quickly incurred massive trading losses. The defendants also misappropriated investor funds, which they used for their own benefit. *See id.* ¶ 23. "By

October 2005, more than eighty percent of the money in the Logos Fund had either been lost trading or otherwise expended by the defendants." Indictment ¶ 22, ECF No. 4.

The defendants formed the second hedge fund, The Donum Fund, LP (the "Donum Fund" or "Donum LP"), in August 2005. Pet. ¶ 5. Its general partner was Donum, LLC, a Delaware limited liability company, and Riddle served as its initial limited partner. *Id.* Unlike the Logos Fund, which targeted individual investors, the Donum Fund targeted larger, institutional investors. *Id.* ¶ 24.

Shortly after forming the Donum Fund, the defendants contacted Financial Pacific, a licensed Panamanian broker-dealer, to discuss investing in the Donum Fund. *Id.* ¶ 9. After conducting some initial investigation into Jadis Investments and Jadis Capital, Financial Pacific received a written proposal to invest in the Donum Fund in September 2005. *Id.* ¶ 11. That same month, two of Financial Pacific's executives traveled to New York to meet with Jadis Capital employees and to tour its offices. *Id.* As with the Logos Fund, the defendants made numerous fraudulent misstatements and omissions regarding the Donum Fund. *See, e.g.*, *id.* ¶ 46.

QBE, one of Financial Pacific's clients, agreed to invest $3 million in the Donum Fund. *Id.* ¶ 12. QBE wired $3 million, through intermediaries, to a Donum LP account and became a limited partner in Donum LP on October 10, 2005. *Id.* Donum LP obtained one or two additional limited partners, who invested $50,000 to $100,000. *Id.* ¶ 2.

By December 2005, the Donum Fund had lost approximately $500,000 through one bad investment, leaving $2,565,456.89 in its accounts. *Id.* ¶¶ 13–14. By that point, the U.S. Securities and Exchange Commission (the "SEC") had been investigating Jadis Capital for some time, and had discovered the defendants' fraud. *See id.* ¶ 13. As a result, Donum LP had been

3

liquidated and its remaining funds were being held in escrow at the SEC's request. *Id.* ¶¶ 13–14. QBE learned that Jadis Investments "was out of business and that there was no one available to provide an accounting of investments and liquidation for Donum LP." *Id.* ¶ 15 (internal quotation marks omitted). QBE did not attempt to recover the funds being held in escrow because the SEC threatened to seize the funds if it did so. *See id.* ¶ 17.

The defendants were indicted in April 2009. In February and March 2010, each defendant pleaded guilty to a charge of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371. On June 23, 2010, this Court entered a preliminary order of forfeiture. The defendants were ordered to forfeit all right, title and interest in two separate funds: (1) $166,075.47 from the Logos Fund, and (2) $2,565,456.89 from the Donum Fund. Preliminary Order of Forfeiture 1–2, ECF No. 56.

On August 3, 2010, QBE petitioned to adjudicate its interest in the Donum Fund's property that was forfeited and to amend the preliminary order of forfeiture. The government moved to dismiss the petition for lack of standing. On December 7, 2011, Judge Carter filed the Report, recommending that the motion be granted. QBE timely filed objections to the Report on December 21, 2011, and the government filed a response to the objections on January 25, 2012.

## DISCUSSION

A.  *Standard of Review*

Pursuant to 28 U.S.C. § 636(b)(1), I must make a *de novo* review of any portions of a report and recommendation to which objections have been made. *T-Mobile Ne. LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 260 (E.D.N.Y. 2011); *see also* Fed. R. Civ. P. 72(b)(3). After review, I may accept, reject or modify any of the magistrate judge's findings or

4

recommendations. *T-Mobile Ne.*, 779 F. Supp. 2d at 260 (citing 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)).

"[A] motion to dismiss a third-party petition in a forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)." *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 241 (2d Cir. 2011) (quoting *Pacheco v. Serendensky*, 393 F.3d 348, 352 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original). Thus, I will assume the well-pleaded facts in the petition are true and determine if QBE has alleged facts plausibly establishing its standing. *See id.* at 241–42; *see also* Fed. R. Crim. P. 32.2(c)(1)(A).

B.  *Standing To Challenge Forfeiture*

A third party "asserting a legal interest in property which has been ordered forfeited to the United States . . . may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2); *see also* 28 U.S.C. § 2461(c); *DSI Assocs. LLC v. United States*, 496 F.3d 175, 183 (2d Cir. 2007) ("[S]ection 853(n) provides the exclusive means by which a third party may lay claim to forfeited assets . . . ."). Following a hearing, the court may determine that "the right, title, or interest" in the forfeited property "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant" or that "the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6). If the court makes such a determination, it must amend the preliminary order of forfeiture accordingly. *Id.*

To have standing to bring a petition under § 853(n)(2), a petitioner must have "a legal interest" in the property at issue. *See United States v. Ribadeneira*, 105 F.3d 833, 835 (2d

Cir. 1997). A general creditor of the defendant lacks an interest in any of the defendant's specific property and, thus, lacks standing under § 853(n)(2). *DSI Accocs.*, 496 F.3d at 184; *Ribadeneira*, 105 F.3d at 835. "State law determines a petitioner's legal interest in the property at issue." *Willis Mgmt.*, 652 F.3d at 242.

C.   *Analysis*

    1.   *QBE's Standing as a Limited Partner of Donum LP*

Under Delaware law, "property of a limited partnership belongs to the partnership as an entity, not to its individual partners." *Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, No. 4791-VCL, 2010 WL 2929552, at *8 (Del. Ch. July 23, 2010); *see also* 6 Del. C. § 17-701; *In re Marriott Hotel Props. II Ltd. P'ship*, No. Civ. A. 14961, 2000 WL 128875, at *15 (Del. Ch. Jan. 24, 2000). However, this is a default rule that may be modified by the terms of a particular partnership agreement. *See McGovern v. Gen. Holding, Inc.*, No. 1296-N, 2006 WL 4782341, at *18 & n.83 (Del. Ch. June 2, 2006).

QBE argues that the terms of Donum LP's partnership agreement gave it a property interest in its capital account held by Donum LP. For the reasons stated in Judge Carter's Report, I conclude that Donum LP's partnership agreement does not modify the default rule that partnership property is that of the partnership, not the limited partners. *See* Report at 10–11.

However, this conclusion does not resolve the question of standing. It appears to be beyond dispute that Donum LP itself would have standing to contest the forfeiture of the Funds. This raises the question as to whether QBE – a limited partner of Donum LP – has standing to contest the forfeiture on Donum LP's behalf. Judge Carter addressed this possibility,

6

suggesting that QBE might seek leave to amend its petition to assert a derivative claim. *Id.* at 14 n.14. In its objections to the Report, QBE has requested such leave to amend.

QBE also argues that, under Delaware law, the present circumstances allow it to assert a direct claim to recover the Funds. *See* Objections to Report & Recommendation 13–15, ECF No. 117 (citing *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 150–51 (Del. Ch. 2003); *In re Cencom Cable Income Partners, L.P. Litig.*, No. 14634, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000); *Blystra v. Fiber Tech Grp., Inc.*, 407 F. Supp. 2d 636, 646–47 (D.N.J. 2005)). The cases cited by QBE stand for the proposition that a limited partner has a direct, rather than a derivative, claim where the partnership is in liquidation, the limited partners and the general partner are in a clearly adversarial relationship, and the injury claimed is a reduction in the individual capital accounts of the limited partners. *See, e.g.*, *Anglo Am. Sec. Fund*, 829 A.2d at 152–53; *Cencom Cable Income Partners*, 2000 WL 130629, at *3; *Blystra*, 407 F. Supp. 2d at 646–47. The government argues that "these corporate law authorities . . . are inapplicable to the present ancillary proceeding, which is instead governed by Section 853." Pl.'s Response to Objections to Report & Recommendation 21, ECF No. 122.

Whether or not QBE may assert a direct claim to the Funds – an issue I need not definitively resolve at this stage – it clearly has derivative standing.[1] A derivative claim does, however, require heightened pleading. *See* Fed. R. Civ. P. 23.1(b). A derivative plaintiff seeking to assert a claim on behalf of a limited partnership must allege it was a limited partner at the "time of the transaction complained of." *Id.* 23.1(b)(1). It must also state, with particularity,

---

[1] The only relevant issue at this stage is standing. The precise legal theory under which QBE can pursue claims to the Funds is immaterial. As explained above, the applicable pleading standard does vary depending on the status of a claim as direct or derivative, but QBE has satisfied the pleading standard for either type of claim. It may be necessary to determine whether QBE's claim is direct or derivative in the event the preliminary order of forfeiture is amended, as the precise nature of the amendment may depend on the nature of QBE's standing.

any efforts it made to have the partnership itself assert the claim or the reasons for not making such efforts. *Id.* 23.1(b)(3).

Although QBE has not expressly pleaded a derivative claim in its petition, it has sufficiently alleged the grounds for derivative standing. It is clear from the petition that QBE was a limited partner at all relevant times. And it is also clear that any attempt to urge Donum LP to assert a claim to the Funds would be futile. The entire Jadis enterprise, including Donum LP and its general partner, Donum LLC, is defunct. The petition details QBE's efforts to recover the Funds and its inability to do so. *See, e.g.*, Pet. ¶¶ 13, 15. It further alleges that "Donum LP has been dissolved due to (either the voluntary or involuntary) withdrawal of the general partner, Donum, LLC." *Id.* ¶ 43; *see also id.* ¶ 44. Given these allegations, I conclude it would be unnecessary and wasteful to require QBE to amend its petition to expressly assert a derivative claim.[2]

In sum, I agree with Judge Carter that QBE does not have a general ownership interest in any of the assets of Donum LP, but I conclude that QBE nevertheless has sufficiently pleaded its derivative standing to pursue claims to the Funds.

2. *QBE's Standing as the Beneficiary of a Constructive Trust*

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."

---

[2] QBE might also have standing pursuant to the provision of the Delaware Revised Uniform Limited Partnership Act that governs the winding up of a limited partnership. *See* 6 Del. C. § 17-803(b). Section 17-803(b) provides that after dissolution of a limited partnership, "the persons winding up the limited partnership's affairs may, in the name of, and for and on behalf of, the limited partnership, prosecute and defend suits, whether civil, criminal or administrative." *Id.* Since QBE alleges that Donum LP has been without a general partner, QBE, as a limited partner, would have the power to wind up Donum LP's affairs and thus to bring suits on its behalf. However, the right to bring suits on behalf of the partnership ends after "the filing of a certificate of cancellation," *id.*, and it is unclear if that certificate has been filed. Since QBE has not pressed this theory of standing, I need not address it further.

*Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919) (Cardozo, J.). Under New York law, which the parties agree governs this issue, a constructive trust may be imposed when there is: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976); *see also In re Ades & Berg Grp. Investors*, 550 F.3d 240, 245 (2d Cir. 2008).

A claimant seeking a constructive trust must be able to trace its property into identifiable assets over which the trust is to be imposed. *See Restatement (Third) of Restitution & Unjust Enrichment* § 55 cmt. g (2011). "Tracing is necessary where a private plaintiff seeks to impose a constructive trust, because liability is premised on the fiction that the victim at all times retained title to the property in question, which the defendant merely holds in trust for him." *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011); *see also United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985) ("It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer.").

QBE alleges in its petition that the money it invested in Donum LP was held in constructive trust for its benefit, and it therefore has a sufficient legal interest in the Funds. *See Willis Mgmt.*, 652 F.3d at 245 ("[A] constructive trust qualifies as a 'legal . . . interest' for the purposes of § 853(n)(6)(A)." (alteration in original)).[3] The government does not dispute that QBE has satisfied the elements required for a constructive trust, but argues that the imposition of a constructive trust is unwarranted for two reasons: First, it contends that QBE has an adequate legal remedy in the form of the remission procedures codified at 21 U.S.C. § 853(i). Since

---

[3] A "legal interest" is one that arises "under the law" rather than one that is "traditionally enforceable at law." *United States v. Schwimmer*, 968 F.2d 1570, 1582 (2d Cir. 1992); *see also Willis Mgmt.*, 652 F.3d at 242. Thus, a party's right to an equitable remedy such as a constructive trust can be sufficient to confer standing. *Schwimmer*, 968 F.2d at 1582; *see also Willis Mgmt.*, 652 F.3d at 242, 245.

9

equitable remedies such as a constructive trust are generally available only in the absence of an adequate legal remedy, the government argues that a constructive trust is unavailable. Second, the government argues that imposition of a constructive trust would be unfair to other victims of the defendants' fraud because it would reduce the pool of assets available for their potential recovery.

Judge Carter correctly rejected the first of the government's contentions. Section 853(i) allows crime victims to petition the Attorney General for remission of forfeited property. It provides merely "a non-judicial remedy that is left entirely to the Attorney General's discretion." *Willis Mgmt.*, 652 F.3d at 243 (internal quotation marks and citation omitted). Despite *dictum* in *United States v. Ribadeneira*, 105 F.3d 833 (2d Cir. 1997), suggesting that 853(i) is an adequate legal remedy, *see id.* at 837 n.5, that is not the law of this Circuit. As Judge Carter correctly recognized, the Second Circuit has rejected the *Ribadeneira dictum* and held that § 853(i) "is not an adequate legal remedy that would deprive a district court of its equitable powers to recognize a constructive trust." *Willis Mgmt.*, 652 F.3d at 244; *see also id.* at 243. Thus, § 853(i) presents no obstacle to QBE's constructive trust claim.

Judge Carter agreed with the government that recognizing a constructive trust in QBE's favor would be unfair to other victims of the defendants' fraud. It would allow QBE to potentially recover the lion's share of the assets available to satisfy the claims of all victims. Judge Carter concluded that "it would be unfair to allow QBE to recover from the limited pool of forfeited assets to the detriment of all the other investors of the Logos and Donum Funds." Report at 14. Invoking a court's authority to "deny a constructive trust where it would lead to an inequitable result," *id.* at 13, Judge Carter concluded that a constructive trust should be rejected

in favor of a more egalitarian distribution of the forfeited assets, to be determined by the Attorney General.

A substantial body of relatively recent case law supports Judge Carter's conclusion. *See, e.g.*, *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88–89 (2d Cir. 2002); *accord United States v. Wilson*, 659 F.3d 947, 956 (9th Cir. 2011); *United States v. Ramunno*, 599 F.3d 1269, 1275 (11th Cir. 2010); *United States v. Andrews*, 530 F.3d 1232, 1238 (10th Cir. 2008); *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996); *see also Willis Mgmt.*, 652 F.3d at 246; *United States v. Dreier*, No. 09-CR-85 (JSR), 2010 WL 1223087, at *2–3 (S.D.N.Y. Mar. 24, 2010). These decisions stand for the proposition that a court should not allow a victim to recover its assets through a constructive trust where doing so would effectively prioritize its claim over those of similarly situated victims. *See, e.g.*, *Credit Bancorp*, 290 F.3d at 88–89. They instead favor a *pro rata* distribution of remaining assets to all victims. *See id.*

The decisions rejecting a constructive trust in multiple-victim fraud cases can generally be traced back to the Supreme Court's decision in *Cunningham v. Brown*, 265 U.S. 1 (1924). *Cunningham* involved investors' claims to the assets of Charles Ponzi in the aftermath of his eponymous fraud scheme. *Cunningham* dealt with tracing "fictions," a set of legal presumptions that courts developed where fungible assets of a fraud victim had been commingled with assets of the wrongdoer, thus complicating the determination of which assets are held in constructive trust. *See id.* at 12–13. For example, courts apply a presumption that when a wrongdoer withdraws money from a commingled fund, he withdraws his own money first rather than the money he has obtained fraudulently. *See, e.g.*, *Bronson Partners*, 654 F.3d at 373 n.8 ("Funds can be traced into commingled accounts and courts apply an irrebuttable

presumption that a wrongdoer spends his own money first."); *see also Cunningham*, 265 U.S. at 12 ("[W]here a fund was composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it would be presumed that in the fluctuations of the fund it was the wrongdoer's purpose to draw out the money he could legally and honestly use rather than that of the claimant . . . ."). Although this rule is fair when determining the rights of a victim relative to a wrongdoer, "when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different." *Cunningham*, 265 U.S. at 13. There is no equitable basis to apply, for example, a fiction that the wrongdoer withdrew one victim's money from the fund rather than another victim's.

But *Cunningham* applies only when it is necessary for a party seeking a constructive trust to resort to tracing fictions. *See Restatement*, *supra*, § 59 reporter's note g. When a party can directly trace its assets, without resorting to fictions or presumptions, a constructive trust is available even in cases involving multiple fraud victims. *Id.* Chief Justice Taft, writing for the Court in *Cunningham*, said as much:

> [The claimants] *could have followed the money wherever they could trace it and have asserted possession of it on the ground that there was a resulting trust in their favor*, or they could have established a lien for what was due them in any particular fund of which he had made it a part. These things they could do without violating any statutory rule against preference in bankruptcy, *because they then would have been endeavoring to get their own money*, and not money in the estate of the bankrupt. But to succeed they must trace the money, *and therein they have failed*.

*Cunningham*, 265 U.S. at 11 (emphasis added); *see also Restatement*, *supra*, § 59 reporter's note g, at 435 ("The holding of Cunningham v. Brown . . . is that the presumptions or marshaling rules (alias 'fictions') . . ., originally designed to regulate the contest between a restitution claimant and a defaulting fiduciary, will not be used to prefer one fraud victim over another. But

12

where one fraud victim can identify his property and another cannot, they are not similarly situated . . . .").

Courts have extended *Cunningham* beyond the context of tracing fictions, and rejected constructive trusts even where there has been no commingling and a claimant can directly trace its property into an identifiable asset. This practice has come under some criticism – for being both doctrinally inconsistent with *Cunningham* and contrary to basic property rights – including in the recently published *Restatement (Third) of Restitution & Unjust Enrichment*. *See Restatement*, *supra*, § 59 reporter's note g, at 436; *see also* Claire Seaton Rosa, *Should Owners Have to Share? An Examination of Forced Sharing in the Name of Fairness in Recent Multiple Fraud Victim Cases*, 90 B.U. L. Rev. 1331, 1358–64 (2010). Under the *Restatement* approach, as in *Cunningham*, tracing fictions are properly disregarded in multiple-victim cases in favor of *pro rata* distribution. But courts are not free to disregard the law of constructive trusts when a claimant can directly trace its property, even if this leaves one innocent victim better off than another equally innocent victim.

Despite the *Credit Bancorp* line of cases, I am not bound to hold that a constructive trust is unavailable to QBE. Cases such as *Credit Bancorp* recognize that a constructive trust *may* be denied in cases involving multiple fraud victims as a matter of discretion.[4] But they do not require that outcome in every case. Even if a constructive trust was

---

[4] The discretion to impose a constructive trust or not based on the court's subjective view of fairness is itself a source of criticism of the *Credit Bancorp* line of cases. *See Restatement*, *supra*, § 59 reporter's note g (criticizing discretionary aspect of *pro rata* distributions and noting that "equitable discretion has never meant that rules are either applied or ignored as the chancellor might elect"); Rosa, *supra*, at 1362–63; *see also In re Grand Jury Proceedings Empanelled May 1988*, 894 F.2d 881, 887 (7th Cir. 1990) ("Modern equity has rules and standards, just like law. And although the ratio of rules to standards is lower in equity than in law, in cases where the plaintiff has an established entitlement to an equitable remedy the judge cannot refuse the remedy because it offends his personal sense of justice." (citation omitted)); *Restatement*, *supra*, § 55 cmt. a ("An application for constructive trust does not require the court to determine *a priori* what 'equity and good conscience' require in a particular case.").

unwarranted under the circumstances in *Credit Bancorp* and similar cases, that does not mean a constructive trust is unavailable any time there are multiple victims of a common fraud.

In some circumstances, it may make sense for similarly situated victims to share in the loss of a common fraud. In a Ponzi scheme, for instance, it will be entirely arbitrary that one investor can trace its assets while another investor cannot:

> [E]arlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity. In such a scheme, whether at any given moment a particular customer's assets are traceable is a result of the merely fortuitous fact that the defrauders spent the money of the other victims first.

*Credit Bancorp*, 290 F.3d at 89 (internal quotation marks and citations omitted).

Whether or not loss sharing is appropriate in cases involving a Ponzi scheme or similar circumstances, it is unwarranted in this case. The defendants established two separate hedge funds. They marketed them separately to different groups of investors at different times. The two hedge funds were legally separate entities and there was no commingling of their assets.[5] Their respective assets were invested differently and suffered different losses at different times. Because of these and other distinctions, QBE and the other victims are not similarly situated and should not share in a *pro rata* distribution of the combined assets of the Logos and Donum Funds. In this case, I will adhere to the "orthodox approach to multiple-fraud cases," which "returns identifiable assets to their owners, turning to pro rata distribution only when

---

[5] The government's arguments are in tension with each other. It argues on the one hand that QBE lacks standing because the legal distinction between a partnership and its partners with respect to partnership property must be respected. On the other hand, it contends that the legal separateness of the Donum Fund from the Logos Fund should essentially be ignored for purposes of restitution. More importantly, in obtaining the preliminary order of forfeiture in this case, the government appears to have completely disregarded the fact that the forfeited funds are property of specific limited partnerships, *not the defendants*. Under the governing statute, forfeiture is authorized only of property belonging to a defendant. *See* 21 U.S.C. § 853(a); *see also United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir. 2005). While the issue is irrelevant for purposes of standing, it appears to be beyond dispute that the defendants never owned the forfeited property and the use of § 853(a) in this case was therefore unwarranted.

14

specific identification or transactional tracing is impossible." *Restatement*, *supra*, § 59 reporter's note g, at 437; *see also, e.g.*, *United States v. Bailey*, No. 1:11cr10, 2012 WL 569744, at *16 (W.D.N.C. Feb. 22, 2012) (holding that constructive trust was appropriate for investors who transferred money to the defendant to purchase specific identifiable assets because they were not similarly situated to investors who transferred money to same defendant for non-existent investment scheme); *S.E.C. v. P.B. Ventures*, No. 90-5322, 1991 WL 269982, at *3 (E.D. Pa. Dec. 11, 1991) (investors in one stock offering were entitled to constructive trust rather than *pro rata* distribution of assets with investors in another stock offering issued and managed by same group of defendants); *cf. Credit Bancorp*, 290 F.3d at 88–89 ("Courts have favored *pro rata* distribution of assets where . . . *the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders*." (emphasis added)).

The difference between the potential recovery of QBE and that of the defendants' other victims is not arbitrary. True, QBE will likely recover the bulk of its investment in the Donum Fund while the investors in the Logos Fund will suffer almost a complete loss. But however fair it may seem to attempt to equalize the victims' losses, it is "inconsistent with fundamental rules of property" for a court to impose "a liability for contribution between victims of a common fraud . . . so that victims who by good fortune have not lost their assets are compelled . . . to make up the losses of those who have." *Restatement*, *supra*, § 59 reporter's note g, at 436–37; *see also id.* cmt. g; Rosa, *supra*, at 1361–62.

Our legal system does not allow the executive or the judiciary, in the name of fairness or equity, to forfeit one fraud victim's property in order to compensate others. *See Bailey*, 2012 WL 569744, at *16 ("The Court . . . cannot order forfeiture merely so that the

15

Attorney General may create a larger restitution pool for the other victims of the Defendant's crimes."); *United States v. Egan*, 811 F. Supp. 2d 829, 840 (S.D.N.Y. 2011) (rejecting argument that government could use forfeited property belonging to a third party "in order to aid in the compensation of other victims because to do so would be more 'fair' in the Government's eyes"). It should make no difference whether the property interest is established by legal title or well-settled equitable rules. QBE has sufficiently pleaded that the Funds were held in constructive trust for its benefit and has standing to challenge the preliminary order of forfeiture on that basis.

## CONCLUSION

For the reasons stated above, the government's motion to dismiss the petition for lack of standing is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: June 8, 2012
      Brooklyn, New York